# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
JOHN FLYNN, et al.,                           )
)
           Plaintiffs,              )
)
      v.                                       )      Civil Action No. 04-2115 (RBW)
)
SOUTHERN SEAMLESS FLOORS, INC.,  )
)
          Defendant.               )
)
———————————————————————)

## MEMORANDUM OPINION

This is an action brought by the International Union of Bricklayers and Allied

Craftworkers ("Bricklayers") and the fiduciaries of (1) the Bricklayers and Trowel Trades

International Pension Fund ("IPF"); (2) the Bricklayers and Allied Craftworkers International

Health Fund ("IHF"); and (3) the International Masonry Institute ("IMI") (collectively "the

plaintiffs") against Southern Seamless Floors, Inc. ("Southern Seamless" or "the defendant") to

enforce the terms of various collective bargaining agreements pursuant to Sections 502(a)(3) and

515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. §§

1132(a)(3), 1145 (2000).[1]  Complaint ("Compl.") ¶ 1.  The plaintiffs allege, inter alia, that the

defendant failed to make the contributions and dues payments required by its 2003 agreement

with the Bricklayers and Allied Craftworkers Local Union No. 32 of Michigan ("Michigan Local

32").  Id. ¶¶ 12, 15, 17, 21; see also id., Exhibit ("Ex.") C ("Michigan Agreement" or "2003

Agreement").  This agreement contains a "traveling contractors clause," which governs all work

---

[1] Plaintiffs IPF, IHF, and IMI are "employee benefit plans" within the meaning of 29 U.S.C. § 1002(3) (2000) and "multiemployer plans" within the meaning of 29 U.S.C. § 1002(37).  Compl. ¶¶ 4-7.

performed by Southern Seamless in conformance with the agreement and undertaken outside of

the agreement's geographic jurisdiction of several Michigan counties.  <u>See</u> Plaintiffs' Motion and

Incorporated Memorandum Regarding the Interpretation of the Traveling Contractors Clause

("Pls.' Mem.") at 2-3; Defendant's Response to Plaintiffs' Motion and Incorporated

Memorandum Regarding the Interpretation of the Traveling Contractors Clause ("Def.'s Mem.")

at 1, 3.  Currently before the Court are the parties' submissions regarding their competing

interpretations of the traveling contractors clause.  Pls.' Mem.; Def.'s Mem.; Plaintiffs' Reply

Memorandum on the Interpretation of the Traveling Contractors Clause ("Pls.' Reply").

Specifically, the plaintiff argues that the clause should be interpreted to "require[] Southern

Seamless, when working outside Michigan, to comply with the 'standard' Bricklayers agreement

in effect in the foreign jurisdiction where the work is performed," whether or not it is a signatory

to the foreign agreement.  Pls.' Mem. at 1.  By contrast, Southern Seamless contends that "the

most reasonable interpretation" of the traveling contractors clause is to bind the employer, when

it performs work outside of Michigan, to the terms of only those collective bargaining

agreements <u>that it has signed</u> with other local Bricklayers unions in the foreign jurisdictions.

Def.'s Mem. at 6.   For the reasons set forth below, the Court agrees with the plaintiffs'

interpretation of the language of the traveling contractors clause contained in the 2003

Agreement.

## I.  Background

The defendant, a Tennessee corporation, executed a number of collective bargaining

agreements with the Bricklayers and its affiliated local unions, Compl. ¶¶ 9-13, pursuant to

which the defendant agreed to make certain contributions and payments on behalf of its

employees to various Bricklayers pension and health funds, id. ¶¶ 15-16.  On June 2, 2005, the

plaintiffs brought suit against the defendant pursuant to Sections 503(a)(3) and 515 of ERISA,

alleging that "an examination of the books and records . . . of [the] [d]efendant revealed that [it]

has . . . failed to make required contributions for employees covered by the Agreements."[2]  Id. ¶

17.  The plaintiffs thus seek a total of $145,518.42 in allegedly unpaid contributions, payments,

and interest owed under the collective bargaining agreements that were in effect from January 12,

2002, through November 30, 2004.  Id. at 6.

      One of the collective bargaining agreements at issue in this action is the 2003 Agreement

with Michigan Local 32, covering the time period between June 1, 2003, and May 31, 2008.[3]

---

[2]  Section 515 of ERISA states that employers are "obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement . . . in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

[3]  Both parties agree that the defendant signed a collective bargaining agreement with Michigan Local 32 in January 2002.  Compl. ¶ 11; id., Ex. A ("2002 Agreement"); Def.'s Mem. ¶ 1.  As discussed in greater detail later in this Order, the traveling contractors clause contained in the 2002 Agreement ("2002 clause") is not identical to the traveling contractors clause contained in the 2003 Agreement ("2003 clause").  See Pls.' Mem. at 2, 7-8; Def.'s Mem. ¶¶ 2-3.  Specifically, while the 2003 clause refers to "a standard collective bargaining agreement of [a Bricklayers affiliate]" in a foreign jurisdiction, 2003 Agreement at 52-53 (emphasis added); see also Pls.' Mem. at 3; Def.'s Mem. at 3 (emphasis added), the 2002 clause describes "an agreement with [a Bricklayers affiliate]" in a foreign jurisdiction, 2002 Agreement at 43 (emphasis added); see also Def.'s Mem. at 2.  In their Motion Regarding the Interpretation of the Traveling Contractors Clause and subsequent Reply Memorandum on the Interpretation of the Traveling Contractors Clause, the plaintiffs offer argument and support almost exclusively for their interpretation of the language of the 2003 clause, and mention only in passing their position regarding the language of the 2002 clause.  See Pls.' Mem. at 2 n.1 (referencing the Plaintiffs' continued belief that the former language clearly and unambiguously requires compliance with the governing Bricklayers agreements in the foreign jobsites, regardless of whether the traveling employers signed any such foreign agreements").  Thus, in accordance with the motion before it, the Court here decides the proper interpretation of the 2003 clause.
      The plaintiffs allege that by signing the 2002 Agreement, the defendant has also agreed to the terms and conditions of the 2003 Agreement.  Compl. ¶ 12; Pls.' Mem. at 2; Pls.' Mem. at 2 n.3 (stating that "in 2002 Southern Seamless signed an agreement with [Michigan Local 32] which serves to bind it to the 2003 agreement containing the revised traveling contractors clause that the [plaintiffs are] relying upon in this case").  However, the defendant suggests, although it does not expressly contend, that it is not bound by the 2003 Agreement.  Def.'s Mem. at 2 (stating that "[w]ithout offering any legal authority to support its position, [the] Plaintiff claims that Southern Seamless is bound by a subsequent collective bargaining agreement with the Bricklayers that is dated June 1, 2003 . . . and that contains a traveling contractor[s] clause substantially similar to the one found in the 2002 [Agreement]"); see also Answer ¶ 12 (denying the plaintiffs' allegation that by entering into the 2002 Agreement, Southern Seamless is also bound to the terms and conditions of the 2003 Agreement).  The enforceability of the 2003 Agreement against
(continued...)

Pls.' Mem. at 2.  This agreement contains a "traveling contractors clause," which provides, in relevant part:

> When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area <u>covered by a standard collective bargaining agreement of another affiliate of the [Bricklayers]</u>, the Employer agrees to abide by the full terms and conditions <u>of the standard Agreement in effect in the jobsite area</u> with respect to all Employees, wherever hired, who perform such work.

Michigan Agreement at 52-53 (emphases added); <u>see also</u> Pls.' Mem. at 3; Def.'s Mem. at 3. The geographic jurisdiction of the Michigan Agreement encompasses "the counties of Monroe, Wayne, Macomb, Oakland, St. Clair, Sanilac, Washtenaw, Lenawee, and Livingston within the State of Michigan."  Michigan Agreement at 1; <u>see also</u> Pls.' Mem. at 2 n.3; Def.'s Mem. at 7-8. Thus, any relevant work performed by Southern Seamless outside of those Michigan counties during the applicable time period would, by both parties' concessions, potentially be covered by this clause.  <u>See</u> Pls.' Mem. at 1; Def.'s Mem. at 1.

On May 22, 2006, this Court held a scheduling conference in which it ordered the parties to file briefs setting forth their positions regarding the proper interpretation of the traveling contractors clause contained in the Michigan Agreement.  <u>See</u> May 24, 2006 Scheduling Order at 1.  In response to the Court's order, the plaintiffs submitted a memorandum arguing that the language of the clause "<u>clearly and unambiguously</u> requires employers . . . when working outside the home jurisdiction of Michigan, to comply with the terms and conditions of . . . the standard

---

[3](...continued)
the defendant is not at issue in the present motion, which was brought for the limited purpose of resolving the proper interpretation of the 2003 traveling contractors clause.  <u>See</u> Pls.' Mem. at 1-2 (exclusively referencing the language of the 2003 clause in bringing the motion).  To the extent that either party believes that resolution of the interpretation of the 2002 clause is <u>also</u> necessary and appropriate in this case, it shall notify the Court of that position.

Bricklayers agreement entered into by all union employers working in that jurisdiction." Pls.'
Mem. at 4-5 (emphasis added). The plaintiffs further contend that "[b]y specifying that Southern
Seamless must comply with the 'standard' Bricklayers agreement in the foreign jurisdiction," the
traveling contractors clause "makes clear that there is no requirement that Southern Seamless be
a signatory to that foreign agreement."[4] Id. at 5.

In response, the defendant argues that the traveling contractors clause only binds it to the
collective bargaining agreements which it signed with local Bricklayers in the foreign
jurisdictions. See Def.'s Mem. at 6. It asserts that the plaintiffs' reading of the traveling
contractors clause is a "strained and overly broad interpretation" which "obligates Southern
Seamless to make certain contributions to the pension and insurance funds that will benefit
members of the [Bricklayers] – but not Southern Seamless' employees – whenever Southern
Seamless works a job [in a foreign jurisdiction] and regardless of whether members of the
[Bricklayers] actually perform work on the job." Id. at 1. This interpretation, opines the
defendant, will lead to a number of "anomalous and counter-intuitive results." Id. at 10; see id. at
7-14. The defendant thus urges the Court to "follow the rationale articulated" in Flynn v. Dick
Corp., 384 F. Supp. 2d 189 (D.D.C. 2005), in which Magistrate Judge Kay interpreted a "nearly
identical" traveling contractors clause, Def.'s Mem. at 5, to mean that the employer was bound
only "to the terms of other [collective bargaining agreements] that the employer had signed with
other local [Bricklayers] when performing work in those [foreign] jurisdictions," id. at 6 (quoting
Dick, 384 F. Supp. 2d at 199 n.7) (internal quotation marks omitted). See generally id. at 4-6.

---

[4] According to the plaintiffs, "[t]he standard agreements in [the] foreign jurisdictions" where Southern
Seamless performed work during the time period relevant to this litigation all required Southern Seamless "to make
fringe benefit contributions . . . [and] dues checkoff payments" to the plaintiffs on behalf of its employees. Pls.'
Mem. at 3.

## II.  Legal Analysis

As an initial matter, the Court declines to accept the defendant's invitation to adopt the reasoning and conclusion of Magistrate Judge Kay in <u>Dick</u> when interpreting the traveling contractors clause at issue in this case.[5]  <u>See</u> <u>Dick</u>, 384 F. Supp. 2d at 199 n.7.  Although the defendant asserts that the traveling contractors clause in the 2003 Michigan Agreement differs in only "minor" and "insignificant" ways from the September 2002 clause examined in <u>Dick</u>, Def.'s Mem. at 6, and claims that the two clauses are "nearly identical," <u>id.</u> at 5, it is evident to the Court that the language of the 2003 clause is distinct enough from the language of the clause in <u>Dick</u> as to render conclusions about the latter essentially unhelpful in interpreting the plain meaning of the former.  <u>Compare</u> Michigan Agreement at 52-53 <u>with</u> <u>Dick</u>, 384 F. Supp. 2d at 196 (quoting clause) (citation omitted); <u>see</u> Pls.' Reply at 2 (stating that "the Bricklayers traveling contractors clause at issue in the present case is a revised clause, fundamentally distinct from the clause addressed by the Court in <u>Dick</u>"); <u>cf.</u> <u>WMATA v. Mergentime Corp.</u>, 626 F.2d 959, 961 (D.C. Cir. 1980) (holding that "[u]nder general contract law, the plain and unambiguous

---

[5]  The plaintiffs argue that the <u>Dick</u> Court's interpretation of the traveling contractors clause is dicta, which should be accorded only minimal persuasive weight.  Pls.' Mem. at 7; Pls.' Reply at 2.  While the Court agrees with the plaintiffs that the relevant discussion in <u>Dick</u> is technically dicta, <u>see</u> 384 F. Supp. 2d at 199 n.7 (stating that "the [<u>Dick</u>] Court need not address whether the traveling contractor[s] clause in the August 2002 [collective bargaining agreement] binds the defendant to any existing [collective bargaining agreement] in Florida" and observing "that the above analysis [regarding the traveling contractors clause] is dicta"), it does note that the <u>Dick</u> Court's analysis of the issue at hand comprises a truly herculean footnote, well over three pages long, in which Magistrate Judge Kay examines with detail and painstaking care the question that is currently before this Court.  <u>Id.</u>  Were it not for the Court's conclusion, <u>infra</u>, that the language of the traveling contractors clause in the 2003 Michigan Agreement is sufficiently different from the language of the clause at issue in <u>Dick</u> as to merit a fully independent examination of its meaning, the Court would certainly give as much regard to the persuasive value of Magistrate Judge Kay's analysis, its status as dicta notwithstanding, as it would to the reasoning offered in support of Judge Lamberth's contrary conclusion in <u>Flynn v. Beeler Barney Assocs. Masonry Contractors, Inc.</u>, Civ. No. 02-1411 (RCL), 2004 WL 3712630 (D.D.C. Aug. 10, 2004).

meaning of an instrument is controlling, and the Court determines the intention of the parties

from the language used by the parties to express their agreement") (citations omitted).

In fact, the clause at issue in <u>Dick</u> is, as far as the Court can discern, instead identical to

the clause found in the 2002 collective bargaining agreement signed by the parties in this case.

<u>Compare</u> Compl., Ex. A ("2002 Agreement") at 43 <u>with</u> <u>Dick</u>, 384 F. Supp. 2d at 196 (quoting

clause) (citation omitted).  Both the 2002 clause and the <u>Dick</u> clause state that if work is

performed by the employer in a foreign jurisdiction "covered by <u>an agreement</u> with another

affiliate of the [Bricklayers]," then the employer must "abide by the full terms and conditions of

<u>the Agreement in effect in the jobsite area</u>."  2002 Agreement at 43 (emphasis added); <u>Dick</u>, 384

F. Supp. 2d at 196 (quoting clause) (citation omitted and emphasis added); <u>see also</u> <u>Flynn v.</u>

<u>Tiede-Zoeller, Inc.</u>, 412 F. Supp. 2d 46, 56-57 (D.D.C. 2006) (analyzing identical clause); <u>Flynn</u>

<u>v. Beeler Barney Assocs. Masonry Contractors, Inc.</u>, Civ. No. 02-1411 (RCL), 2004 WL

3712630, at *5 (D.D.C. Aug. 10, 2004) (same).  By contrast, the 2003 clause refers to "a <u>standard</u>

collective bargaining agreement of another affiliate of the [Bricklayers]" in the foreign

jurisdiction and requires the employer "to abide by the full terms and conditions of the <u>standard</u>

Agreement in effect in the jobsite area."  Michigan Agreement at 52-53 (emphases added).

Given the addition of the word "standard" to the 2003 clause, it must fairly be said that the 2003

clause is at least facially distinct from the 2002 clause and from the clause examined in <u>Dick</u> and

other cases in this Circuit.[6]  <u>See</u> <u>Aka v. Wash. Hospital Ctr.</u>, 116 F.3d 876, 892 (D.C. Cir. 1997)

---

[6]  In concluding that the 2003 clause is linguistically different from the 2002 clause, the Court need not, and does not, give any weight to the plaintiff's contention that "[t]he reference to the 'standard' agreement was inserted into the Bricklayers clause for the very purpose of avoiding the uncertainty that the Bricklayers union and fund had encountered when enforcing the traveling [contractors] clause." Pls.' Reply at 3; <u>see also</u> Pls.' Mem. at 6 n. 6 (stating that the plaintiffs are "prepared to submit evidence establishing that the traveling contractors clause in the
(continued...)

(holding that "courts should assume that the parties intended for every part of an agreement to

have meaning . . . [and] should give preference to interpretations that do not render any portion of

the agreement ineffective or mere surplusage") (citation omitted); Mergentime Corp., 626 F.2d at

961 (holding that in interpreting the language of a contract, "the Court should construe the

contract as a whole so as to give meaning to all of the express terms") (citation omitted).  And,

because the Court concludes, infra, that the language of the 2003 clause—and particularly the

twin references to "a standard collective bargaining agreement of another [Bricklayers] affiliate"

and "the standard Agreement in effect in the jobsite area," Michigan Agreement at

52—unambiguously supports the interpretation suggested by the plaintiffs, it is unnecessary for it

to rely in any respect on extrinsic evidence of the clause's meaning, such as the wording of an

earlier clause or other courts' interpretations of similar but not identical language in previous

cases.[7]  See Commonwealth Commc'ns., Inc. v. NLRB, 312 F.3d 465, 468 (D.C. Cir. 2002)

(holding that "[i]n the absence of ambiguity in [a] collective bargaining agreement . . . [courts]

have no cause to examine extrinsic evidence of the parties' intent") (internal quotation marks and

---

[6](...continued)
Michigan Agreement was revised specifically to remove any ambiguity as to whether the reading of the clause urged by the [plaintiffs] is correct").

   [7]  The parties do not cite, and the Court cannot find, any cases in which courts have interpreted the language of the 2003 traveling contractors clause at issue here.  Moreover, the courts in this Circuit that have interpreted clauses mirroring the language of the earlier 2002 traveling contractors clause have reached conflicting results.  See Tiede-Zoeller, 412 F. Supp. 2d at 57-58 (finding the language of the traveling contractors clause ambiguous); Dick, 384 F. Supp. 2d at 199 n.7 (agreeing with Southern Seamless's interpretation of the clause); Beeler Barney, 2004 WL 3712630, at *6 (agreeing with the Bricklayers' interpretation of the clause and finding that the language "is unambiguous and subject to only one reasonable meaning"); cf. Trs. of the BAC Local 32 Ins. Fund v. Ohio Ceiling and Partition Co, Inc., 48 Fed. Appx. 188, 195 (6th Cir. 2002) (finding the language of the clause ambiguous); Local Union No. 36, Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Atlas Air Conditioning Co., 926 F.2d 770, 772 (8th Cir. 1991) (agreeing with the Bricklayers' interpretation of the clause); Trs. of the BAC Local 5 N.Y. Ret., Welfare Apprenticeship Training and Journeyman Upgrading and Labor-Management Coal. Funds v. Charles T. Driscoll Masonry Restoration Co., Inc., 165 F. Supp. 2d 502, 511 (S.D.N.Y. 2001) (agreeing with Southern Seamless's interpretation of the clause).

citation omitted); <u>Papago Tribal Util. Auth. v. FERC</u>, 723 F.2d 950, 955 (D.C. Cir. 1983) (holding that "in the absence of ambiguity[,] the intent of the parties to a contract must be ascertained from the language thereof") (internal quotation marks and citation omitted).  The Court will therefore turn to an examination of the plain meaning of the traveling contractors clause contained in the 2003 Michigan Agreement.

As previously mentioned, the clause at issue in the motion before the Court makes reference to "a <u>standard</u> collective bargaining agreement of another affiliate of the [Bricklayers]" in the foreign jurisdiction and requires the employer "to abide by the full terms and conditions of the <u>standard</u> Agreement in effect in the jobsite area."  Michigan Agreement at 52-53 (emphases added); <u>see</u> <u>also</u> Pls.' Mem. at 3; Def.'s Mem. at 3.  According to the Supreme Court, the word "standard" is defined as "established by authority, custom, or general consent, as a model or example; criterion; test."  <u>Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.</u>, 541 U.S. 246, 252-53 (2004) (quoting Webster's Second New International Dictionary 2455 (1945)) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>United States v. Jones</u>, 57 F.3d 1020, 1024 (11th Cir. 1995) (defining standard as "something that is established by authority, custom, or general consent as a model or example to be followed") (quoting  Webster's Third New International Dictionary 2223 (1986)) (internal quotation marks omitted); <u>Hoover v. Byrd</u>, 801 F.2d 740, 741 (5th Cir. 1986) (same).  Similarly, Black's Law Dictionary defines "standard" as "[s]tability, general recognition, and conformity to established practice. . . .  A type, model, or combination of elements accepted as correct or perfect."  Black's Law Dictionary 1259 (5th ed. 1979).  Given these definitions, it seems clear that the language of the 2003 clause was meant to refer to the collective bargaining agreement <u>generally</u> and <u>customarily</u> entered into by

9

employers and a foreign Bricklayers affiliate, whether or not Southern Seamless itself was a signatory to that foreign agreement.  Any other interpretation of the clause would make the reference to a "standard" collective bargaining agreement wholly superfluous, a result which is strongly disfavored in the law.  Aka, 116 F.3d at 892 (holding that "courts should assume that the parties intended for every part of an agreement to have meaning . . . [and] should give preference to interpretations that do not render any portion of the agreement ineffective or mere surplusage") (citation omitted); Mergentime Corp., 626 F.2d at 961 (holding that in interpreting the language of a contract, "the Court should construe the contract as a whole so as to give meaning to all of the express terms") (citation omitted).

Indeed, the defendant has failed to offer an alternative explanation for the use of the word "standard" in the 2003 clause, or any definition or connotation of that word which might reasonably refer to a particular collective bargaining agreement specifically signed by Southern Seamless and a foreign Bricklayers union, rather than a generic "model or example" of the agreement typically offered by a Bricklayers affiliate in a foreign jurisdiction in which Southern Seamless is performing its work, Engine Mfrs. Ass'n, 541 U.S. at 252-53 (defining "standard"). See generally Def.'s Mem.  Instead, the defendant contends, in conclusory fashion, that the phrase "a standard collective bargaining agreement of another [Bricklayers] affiliate," Michigan Agreement at 52; see also Pls.' Mem. at 3; Def.'s Mem. at 3, should be interpreted as "a standard bargaining agreement between Southern Seamless and another Bricklayers [affiliate]."  Def.'s Mem. at 6 (emphasis added).  If this were the case, however—if the parties had intended the clause to bind Southern Seamless only to foreign agreements that Southern Seamless itself had

signed—then the term "standard" would be confusing or meaningless.[8]  Had the drafters of the

clause contemplated the interpretation suggested by the defendant, they would much more likely

have used the term "an agreement" rather than "a standard collective bargaining agreement," or

even made specific reference to "the agreement that this Employer signed."  Furthermore, the

terms "standard agreement" or "standard contract," as referenced by other courts, invariably

denote a "normal" or "typical" agreement between parties in a given contractual situation, often

in conformance with one party's boilerplate form of terms and conditions, rather than a single,

particularized agreement between two named signatories.  See, e.g., Rosenberger v. Rector and

Visitors of Univ. of Va., 515 U.S. 819, 824 (1995) (discussing "[a] standard agreement signed

between each [qualifying student organization] and the [u]niversity") (citation omitted); Pub.

Util. Comm'n of the State of Calif. v. FERC, 236 F.3d 708, 713 (D.C. Cir. 2001) (finding that a

contract between El Paso Natural Gas Co. and its affiliate "conformed to the standard contract in

El Paso's tariff"); Am. Family Life Assurance Co. of Columbus v. FCC, 129 F.3d 625, 626 (D.C.

Cir. 1997) (observing that the plaintiff "insisted on its standard contract" when approached by a

party wishing to buy time on several commercial television stations); N. States Power Co. v.

Dep't of Energy, 128 F.3d 754, 756 (D.C. Cir. 1997) (referring to the "[s]tandard [c]ontract"

entered into by the Department of Energy with various owners and generators of radioactive

waste) (citations omitted); Air Transp. Ass'n of Am. v. Reno, 80 F.3d 477, 479 (D.C. Cir. 1996)

(noting that government agency "developed a standard contract with the airlines" and that "most

---

[8]  In addition, as the plaintiffs point out, such a limited interpretation of the language of the clause makes little sense, as "any traveling employer would . . . be bound to any separate foreign agreements it signed in the jobsite jurisdiction regardless of whether any traveling contractors clause even existed."  Pls.' Reply at 5 (emphases removed); see also Beeler Barney, 2004 WL 3712630, at *7 (observing that "if the employer was signatory to an agreement in the jobsite area, there would be no need for a traveling contractors clause").

major airlines have signed [the] agreements") (citation omitted); <u>United States v. Republic Servs., Inc.</u>, Civ. No. 00-1469 (RMU), 2004 WL 3176546, at *2 (D.D.C. Nov. 30, 2004) (directing the plaintiff to modify the terms of its "standard contract" and to offer that contract to "all new . . . customers and existing customers who sign new contracts"); <u>United States v. Computer Assocs. Int'l, Inc.</u>, Civ. No. 01-2062 (GK), 2002 WL 319661456, at *8 (D.D.C. Nov. 20, 2002) (noting that the plaintiff "often deviated from the terms of its standard contract and accepted non-standard terms, such as terms proposed by customers," when signing particular contracts).   Even <u>Dick</u>, on which the defendant relies in support of its interpretation of the 2003 clause, contrasts a "valid [collective bargaining agreement] in effect at the job site" and enforceable against its signatories with "<u>a standard form or draft agreement</u>, completed and made enforceable only with the addition of an addendum detailing benefit payments and contractual ratification by real parties."   <u>Dick</u>, 384 F. Supp. 2d at 200 (citation omitted) (emphasis added). The phrase "the standard agreement in effect in the jobsite area" found in the 2003 clause, Michigan Agreement at 52; <u>see also</u> Pls.' Mem. at 3; Def.'s Mem. at 3, thus appears to this Court to refer unambiguously to "a standard form or draft agreement," used by a Bricklayers affiliate in a foreign jurisdiction, which has been ratified by at least one employer so that it is "in effect in the jobsite area," whether or not Southern Seamless itself is a signatory to the foreign agreement.[9]

_____

[9] Moreover, the use of the word "of" in the clause's earlier phrase—"a standard collective bargaining agreement <u>of</u> another [Bricklayers] affiliate," Michigan Agreement at 52 (emphasis added); <u>see also</u> Pls.' Mem. at 3; Def.'s Mem. at 3—provides further support for the plaintiffs' interpretation of the plain meaning of the 2003 clause, as it clearly suggests that the "standard collective bargaining agreement" referenced in the clause is properly identified in connection with a foreign Bricklayers affiliate, rather than with the foreign affiliate <u>and</u> a particular signatory, such as Southern Seamless.  By contrast, if the clause were to read "a standard collective bargaining agreement <u>with</u> another [Bricklayers] affiliate," it would be ambiguous as to whether the clause was intended to bind Southern Seamless only to foreign agreements that Southern Seamless itself signed <u>with</u> a foreign affiliate. <u>Cf.</u> <u>Johnson v. United States</u>, 529 U.S. 694, 704 (2000) (noting that Congress's use of the term "revoke" rather than "terminate" in a statutory clause suggested a particular linguistic connotation).

<u>Dick</u>, 384 F. Supp. 2d at 200 (citation omitted); <u>see also</u> <u>Ameren Servs. Co. v. FERC</u>, 330 F.3d

494, 499 (D.C. Cir. 2003) (holding that "[a] contract is ambiguous if it is reasonably susceptible

of different constructions or interpretations, not simply because the parties later disagree on its

meaning") (internal quotation marks and citations omitted).

   Finally, the Court is not persuaded by the defendant's contention that the plaintiffs'

interpretation of the traveling contractors clause will "lead to anomalous results that could not

have been contemplated by the parties." Def.'s Mem. at 4; <u>see id.</u> at 7-14. As discussed above,

courts "determine the plain meaning of a contract from the language used by the parties to

express their agreement." <u>Ameren</u>, 330 F.3d at 499 (internal quotation marks and citation

omitted). Where, as here, the Court has concluded that the meaning of the contractual language

is "clear and unambiguous," it can look no further in its interpretation of the provision at issue.

<u>NRM Corp. v. Hercules, Inc.</u>, 758 F.2d 676, 681-82 (D.C. Cir. 1985) (holding that "[w]here the

language of a contract is clear and unambiguous on its face, a court will assume that the meaning

ordinarily ascribed to those words reflects the intentions of the parties") (citation omitted); <u>see</u>

<u>also</u> <u>Mergentime</u>, 626 F.2d at 961 (holding that "[u]nder general contract law, the plain and

unambiguous meaning of an instrument is controlling"). The defendant has not demonstrated

that the plain meaning of the traveling contractors clause, which accords with the plaintiffs'

suggested interpretation, will be fundamentally unworkable or will somehow lead to an absurd

result. <u>Cf.</u> <u>Friends of Earth, Inc. v. EPA</u>, 446 F.3d 140, 146 (D.C. Cir. 2006) (holding that

agencies "seeking to demonstrate absurdity" and "to avoid a literal interpretation [of the statutory

text] must show either that, as a matter of historical fact, Congress did not mean what it appears

to have said, or that, as a matter of logic and statutory structure, it almost surely could not have

meant it") (internal quotation marks and citation omitted).  As the Supreme Court stated in

Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, ___ U.S. ____, 126 S.Ct. 2455 (2006), if "the

statutory language is plain, the sole function of the courts—at least where the disposition

required by the text is not absurd—is to enforce it according to its terms." Id. at ___, 126 S.Ct. at

2459 (internal quotation marks and citations omitted).  The same holds true when courts interpret

the intent of private parties to an enforceable contract where the terms of their agreement are

"clear and unambiguous." NRM Corp., 758 F.2d at 681.  Accordingly, the Court agrees with the

plaintiff's interpretation of the 2003 traveling contractors clause.

### III. Conclusion

For the foregoing reasons, the Court concludes that the traveling contractors clause found

in the 2003 Michigan Agreement requires the defendant to abide by the standard Bricklayers

collective bargaining agreement in effect in a foreign jurisdiction in which it performs covered

work, whether or not it is a signatory to the foreign agreement.

**SO ORDERED** this 26th day of October, 2006.[10]


REGGIE B. WALTON
United States District Judge

---

[10] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.